**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Farley Lee,** | ) | **CASE NO. 1:15 CV 91** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **The Cleveland Clinic Foundation, et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 23). This case arises out of plaintiff's former employment with defendants. For the following reasons, the motion is GRANTED.

<u>**Facts**</u>

Plaintiff Farley Lee filed this Complaint against defendants The Cleveland Clinic Foundation (CCF) and Josalyn R. Meyer.  Meyer is the Nurse Manager at CCF's Cardiac Step Down Unit.  According to Meyer, CCF is a private, non-profit academic medical center that integrates clinical and hospital care with research and education.  CCF's world renowned

1

Heart and Vascular Institute includes the Cardiac Step Down Unit which serves patients experiencing myocardial infarction, post cardiac intervention, chronic heart failure, dysrhythmia management, and pulmonary hypertension.

Plaintiff's national origin is Chinese, but she was born and raised in India. Plaintiff began her employment at the CCF in 1976 as a nursing assistant and then became a registered nurse (RN) in 1981. In 2003, plaintiff was awarded Nurse of the Year, even receiving a handwritten note of congratulations from CCF's CEO. At the end of her employment, plaintiff worked in the Cardiac Step Down Unit and Meyer was her direct supervisor. At that point, plaintiff was 61 years old.

According to Meyer, due to the highly stressful environment of the Cardiac Step Down Unit, nurses are generally not disciplined for the first or second patient related issues. Rather, those issues are addressed through counseling and notes to the employee's file in the form of an "anecdotal."  When those counselings are unsuccessful and a pattern of unacceptable behavior emerges, CCF will "step in" with either a performance improvement plan (PIP), written discipline, or both.  (Meyer decl.)

Beginning in 2009, various issues were brought to plaintiff's attention but she was not disciplined for them.  In 2009, plaintiff received an anecdotal for an error on an admission assessment, a memorandum regarding a failure to document appropriately on a chart, and a note regarding two incomplete admission assessments.  In 2009, plaintiff also received an email for her "excellence" in documenting during a random chart auditing.  In 2010, an anecdotal was issued because plaintiff and another nurse were yelling at each other during an argument at the nurses's station regarding the morning assignment. In 2010 and 2011,

2

plaintiff was issued four "reminders" regarding failure to complete chart documentation appropriately.  In 2012, plaintiff was issued a memorandum for failure to complete the appropriate documentation for a patient room admission checklist. (pltf. depo. Ex. 9)

Plaintiff received an overall performance summary of "fully meets expectations"[1] on her performance review for 2012 which was completed on March 29, 2013.  Her supervisor noted:

> Farley is a veteran nurse on J71.  Her experience makes her an excellent resource to her co-workers.  She acts as a Coach for new nurses regularly and allows nursing students to shadow her for their practicum experience.  Farley is always willing to stay over and help the unit with staffing.  At times Farley appears overwhelmed and verbalizes she has a 'heavy assignment' or 'a lot is going on.' I encourage Farley to work on identifying stressors and intervene upon them in her own practice before the situation escalates beyond her control.  Taking accountability for our own actions and attitude shows professionalism.  Farley has attended 10/10 mandatory staff meetings in 2012.  Thank you for being a part of the J7's team.

(pltf. depo. Ex. 11)

A couple incidents were documented in 2013.  On August 6, 2013, a note indicated that plaintiff "seemed extremely frustrated lately and can be quite rude," and that "plaintiff frequently complains about her assignment" and makes "comments about patients, like calling them 'fat pigs.'" (pltf. depo. Ex. 14) In her deposition, plaintiff denied calling the patient a "fat pig," but stated that she called him "very obnoxious."  (pltf. depo. 95-96) Plaintiff also acknowledged at deposition that she sent a communication to a supervisor in August 2013, assuming, in error, that the supervisor was discharging a patient before plaintiff had completed a discharge summary.  Plaintiff admitted she was "very emotionally charged" and

---

[1]    The scores included "needs improvement," "meets most expectations," "fully meets expectations," and "exceptional performance."

that the supervisor was "offended" by the communication.  (pltf. depo. 109-115) On

November 7, 2013, it was documented that a patient's wife complained that plaintiff was

"rude" to her, "had been loud and cut her off every time she would speak."  (pltf. depo. Ex.

15) Plaintiff acknowledged at deposition that the wife was "very upset" with her.  (pltf. depo.

119-122) Meyer noted the next day that she spoke with plaintiff and advised her that if further

similar incidents occur, a corrective action may be issued. (pltf. depo. Ex. 16)

Plaintiff's 2013 review, completed on April 2, 2014, also received a summary "fully

meets expectations."  Her supervisor noted:

> Farley has a wealth of knowledge and passion for the cardiac population and her
> patients.  She is a strong advocate for their care and health promotion.  Farley receives
> a numerous amount of positive feedback from patients and families.  However, at
> times Farley can come across as harsh when she interacts with patients and colleagues
> such as LIPs. I encourage Farley to continue to advocate but to be aware of how she
> may be perceived.  Farley is in school pursuing further education in nursing.  Keep up
> the Great Work!

(pltf. depo. Ex. 18)

On April 30, 2014, a "Corrective Action Report- Documented Counseling" and a

Performance Improvement Plan (PIP) were issued to plaintiff. (pltf. depo. Exs. 22, 24) The

Corrective Action Report noted that plaintiff had "had multiple complaints from patients, and

family members regarding your approach to patient care and communication.  The consistent

description of your communication style is abrasive, rude, and pushy.  All of these concerns

have been discussed with you."  Two "recent situations" were noted: April 10, 2014- "Patient

and family stated that you were 'pushy and abrasive and placed blame on the patient for not

communicating a medication concern,' stating that you did not have time to resolve."  April

14, 2014- "Patient and family stated that you were 'pushy in how you spoke and responded to

patient needs,' and felt that you placed blame for a medication error on someone else who was not present, then asking them multiple times not to tell anyone."  Plaintiff refused to sign the Corrective Action Report.  (*Id.*)

The PIP noted two job duties that were not being performed at the expected level of competency: "demonstrate effective communication and interpersonal skills with patients and team members" and "accepts constructive criticism and changes behavior according." Examples were given of the deficiencies and expectations were stated.  Again, plaintiff refused to sign. (pltf. depo. Ex. 24)  Plaintiff was also referred to CCF's employee assistance program.  (pltf. depo. 175; Meyer depo. 188)

On the same day that the Corrective Action and PIP were issued, plaintiff met with Meyer and Debbie Brosovich, the Assistant Director of Nursing at the Heart Institute. Meyer prepared a written memorandum of the conversation. (pltf. depo. 23)   Three "follow up items" were identified:

> #1 was follow up with CONCERN [the employee assistance program]. Farley stated that she has had 2 appointments and has more scheduled and she is feeling better. #2 was HR information as she has stated that she wanted to make a formal complaint. Debbie mentioned the process of writing an email and #3 follow up with her behaviors that needed to be addressed.

In discussing the patient complaints and Corrective Action, it was noted that plaintiff "stated that she is not appreciated for anything rather I was focusing on little problems that the patients should not even be mad about."  And, when told that "we are going to work together to turn this around with the help of a performance improvement plan, Farley stated, 'I do not need help.'" (*Id.*)

According to plaintiff's affidavit, she was called into Meyer's office on April 15,

2014. Plaintiff avers that Meyer "accused [plaintiff] of being pushy or abrasive with a patient. Ms. Meyer mischaracterized the incident and I disagreed with her conclusions. I also complained during this meeting that I was being unfairly scrutinized, treated differently than the other RNs, and being discriminated against because of my age and race." Plaintiff further avers that during the April 30 meeting, when Meyer and Brosovich gave plaintiff the Corrective Action and PIP, she "disagreed" with them and, therefore, refused to sign. (pltf. aff.)

> Plaintiff also avers,
>
> A couple days after the April 15, 2014 meeting with Josalyn Meyer, I met with Deborah Brosovich.[2]  During this meeting, I complained of age and race discrimination and that I was being subjected to a hostile work environment. Ms. Brosovich told me that I had to take my discrimination complaints to CONCERN, which is part of Cleveland Clinic's Employee Assistance Program.
>
> I scheduled a meeting with CONCERN. I met with Sherry Wexler, who I believe is a counselor with CONCERN. I complained to Ms. Wexler that I felt devalued by Josalyn Meyer because of my age and race. I further reported to Ms. Wexler that my older colleagues and I have been told that if we are unhappy, we could easily be replaced.

(*Id.*)

The evidence shows that by email of May 1, 2014 to Jill Prendergast, CCF's HR Director, plaintiff stated that she was "writing to formally request to appeal the" PIP and "review and discuss the corrective action that Ms. Josalyn Meyer provided me."  (Prendergast depo. Ex. 82) Plaintiff also stated, "The hostile work environment that [Meyer] is creating might affect the quality of care that is being provided to our clients."  (*Id.*)  On May 6, 2014,

---

[2]     In her deposition, plaintiff testified that she contacted Brosovich by email on April 19.  (pltf. depo. 164) The errata sheet to the deposition corrects the date to identify it as April 18.

6

plaintiff sent an email to Lisa Ullman, HR Generalist, stating, "I am now writing to formally request to appeal my Job Performance Improvement Plan that was given to me on April 30, 2014 at 15:30 hours.  I would also like to review and discuss the corrective action that Ms. Josalyn Meyer provided me..." Further, I would like to schedule a meeting to discuss the Job Performance Improvement Plan, the corrective action from Ms. Josalyn Meyer, and the current difficult work environment. I strongly believe that the actions taken by Ms. Josalyn Meyer were inappropriately applying the Cleveland Clinic Foundations' policies and procedures.  The hostile work environment that Ms. Josalyn Meyer is creating might affect the quality of care that is being provided to our clients."  (Prendergast depo. Ex. 83)

Ullman testified that she met with plaintiff who told her she felt she was being discriminated against on the basis of age and race. But plaintiff could provide no specifics other than Meyer's comments about retirement. And, when asked, plaintiff could not tell Ullman what specifically Meyer told her about retiring.  Ullman testified, "My conclusion on [plaintiff's] investigation was there was no investigation.  Didn't need to be an investigation, because there was nothing to investigate.  She just made these charges and couldn't substantiate." When asked whether she made any effort to determine whether others in the department were treated differently, Ullman responded, "I asked Farley in our meeting how she felt she was being discriminated against, and I got nothing."  (Ullman depo. 76-78, 100-109)

Plaintiff was meeting the expectations under the PIP until another incident arose in July.  (Brosovich depo. 191) On July 18, 2014, plaintiff was issued a Corrective Action Report- Written Warning.  (pltf. depo. Ex. 28) It was noted:

7

On 7/14/14 it was noted that you did not provide safe care for a patient with a serious medical condition (Aneurysm).  You failed to monitor and escalate elevated vital signs to the medical team.  Notification of the patients' arrival to the nursing unit and of their condition was not timely (4+ hours).  This resulted in significant delay of treatment.  When this situation was reviewed with you, you took no personal accountability for the lack of nursing care and communication provided.

A similar situation was previously reviewed with you on 4/25/14.  Your failure to manage a patients [sic] lab values appropriately resulted in delay of treatment in which you took no personal accountability for the lack of nursing care and communication provided.

(*Id.*)  Plaintiff refused to sign this Corrective Action.

Plaintiff's affidavit states that she "disagreed with the July 18, 2014 corrective action. I provided appropriate care to the patient in J-71, Room 12.  I further elevated all concerns in a timely manner and provided care in accordance with my training and experience.  The July 18, 2014 corrective action also referenced an alleged incident that occurred on April 25, 2014 related to a failure to manage a patient's lab values.  Josalyn Meyer never reviewed this incident with me at any time prior to July 18, 2014." (plftf. aff.)

There is evidence that plaintiff confronted the patient about reporting the incident which resulted in the Corrective Action Report. On the date the discipline was issued, July 18, 2014, Meyer memorialized a conversation she had with a nursing assistant who stated that the patient told him that plaintiff had said to her, "Why did you go to management about me not taking a manual blood pressure, and that now she is fired."  The patient said the interactions with plaintiff had upset her which was causing burning in her chest.  Plaintiff had also told the patient that "the reason they are firing me is because I have been here for 36 years."  (pltf. depo. Ex. 26)

Meyer then memorialized a conversation she had with plaintiff on that date, July 18,

8

wherein Meyer asked plaintiff about confronting the patient and telling her she had been fired.

Plaintiff acknowledged that she had "a casual conversation" with the patient.  When asked by

Meyer how the patient heard that she had been fired, plaintiff "stated that she told the

patient." When told the conversation was inappropriate and had caused burning in the

patient's chest, plaintiff responded loudly that "the patient is fine, do you want to go talk to

her with me, this is crazy." Meyer told plaintiff that her actions were inappropriate and she

was being suspended for "at least three days, Mon, Tues, and Wed" pending investigation.

Meyer told plaintiff that she would "be doing a full investigation of this serious occurrence."

Meyer told plaintiff "not to return to work or call in to the unit until [Meyer] called her."

Plaintiff responded, "You just are trying to make stuff up to get rid of me."  (pltf. depo. Ex.

27)

      In an email sent July 21, 2014, and dated July 20, 2014, plaintiff stated, "Effectively

immediately on this day of Sunday, July 20th, 2014 I am submitting my resignation to The

Cleveland Clinic Foundation after 38 years of service."[3]  (pltf. depo. Ex. 29)  She thereafter

filed this Complaint which sets forth seven claims.  Count One alleges age discrimination

under the Age Discrimination in Employment Act (ADEA) and the Ohio Revised Code

(ORC).  Count Two alleges retaliation under the ORC, ADEA, and Title VII.  Counts Three

and Four[4] allege race and national origin discrimination under the ORC and Title VII.  Count

Five alleges negligent retention, supervision, and hiring against CCF.  Count Six alleges

---

[3]      Plaintiff testified there was a delay in sending the letter because she attempted suicide on July 19. (pltf. depo. 287-288)

[4]      The Complaint groups these claims together as the "Third and Fourth Causes of Action."

intentional infliction of emotional distress. Count Seven alleges aiding and abetting.

This matter is now before the Court upon defendants' Motion for Summary Judgment.

**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec.*

10

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Age, Race, National Origin Discrimination**

Counts One, Three, and Four allege age, race, and national origin discrimination under the corresponding federal and state statutes. The federal and state discrimination claims are analyzed in the same manner. *Voltz v. Erie County,* 617 Fed.Appx. 417 (6th Cir. 2015). "A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence that would support an inference of discrimination." *Weeks v. Michigan Dept. of Community Health,* 587 Fed. Appx. 850 (6th Cir. 2014) (citations omitted). Plaintiff asserts she has direct evidence of discrimination.

"Direct evidence is evidence that requires the conclusion, without any inference, that unlawful discrimination was at least a motivating factor in an employer's actions." *Douglas v. Eaton Corporation,* 577 Fed.Appx. 520 (6th Cir. 2014) (citing *Johnson v. Kroger Co.,* 319

11

F.3d 858 (6th Cir. 2003)). "Comments made by individuals who are not involved in the decision-making process regarding plaintiff's employment do not constitute direct evidence of discrimination." *Sami v. Detroit Medical Center,* 591 Fed.Appx. 419 (6th Cir. 2014) (citing *Carter v. Univ. of Toledo*, 349 F.3d 269 (6th Cir. 2003)). "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, do not suffice to satisfy the plaintiff's burden to demonstrate animus." *Flones v. Beaumont Health System,* 567 Fed.Appx. 300 (6th Cir. 2014) (citing *Geiger v. Tower Auto,* 579 F.3d 614 (6th Cir. 2009) (other citations omitted).

Plaintiff asserts she has the following direct evidence of discrimination.  Meyer asked plaintiff on several occasions when she planned to retire and commented that nursing had changed, and time was passing her by.  She made these comments when she gave plaintiff her performance reviews in 2013 and 2014.  (pltf. depo. 305-306, 349) Meyer also compared plaintiff to Meyer's father, stating that her father did not know when to retire.  (*Id.* 347-348) Additionally, plaintiff's co-workers called her "oldbie," "old bitch," "legend," and "seasoned."  One co-worker made offensive comments about plaintiff's Chinese heritage when she commented to plaintiff when she was heating up her rice, "I like lice, not rice" and "you Chinese people eat anything that crawls and walks."  The same co-worker also commented, "How come you're Chinese and you don't have chinky eyes."  (*Id.* 170, pltf. aff.)

Initially, the comments made by the co-workers are not direct evidence as they were not made by the decisionmaker.  Thus, the only alleged direct evidence relates to the age discrimination claim only.  Nonetheless, Meyer's comments, are "unrelated to the decisional process itself" and, therefore, are not direct evidence.  As discussed below, plaintiff did not

12

suffer an adverse employment action. But even assuming at this point that the adverse actions were the corrective actions and suspension, the comments were not made at that time. Additionally, comments about "when she planned to retire" do not constitute direct evidence. In *Scheick v. Tecumseh Public Schools,* 766 F.3d 523 (6th Cir. 2014), the court found that the decisionmaker's statement during plaintiff's performance review that "the Board wants you to retire" was not direct evidence as it required an inference to conclude that retirement was a proxy for age. The court cited *Scott v. Potter,* 182 Fed.Appx. 521 (6th Cir. 2006) (finding the statement "why don't you retire and make everybody happy?" to not constitute direct evidence of age discrimination). Finally, comments comparing plaintiff to Meyer's father are not direct evidence as they require an inference.

Without direct evidence, plaintiff must proceed on her discrimination claims through the well-settled burden-shifting framework. Plaintiff bears the initial burden of establishing a prima facie case of age, race, and national origin discrimination. Accordingly, plaintiff must prove that 1) she was a member of the protected class, 2) she was subjected to an adverse employment action, 3) she was otherwise qualified for the position, and 4) she was replaced by someone outside the protected class or similarly situated non-protected employees were treated more favorably than plaintiff. *Yasdian v. ConMed Endoscopic Technologies,* 793 F.3d 634 (6th Cir. 2015).

Once the plaintiff satisfies her initial burden, the burden of production shifts to defendants to proffer a legitimate, nondiscriminatory reason for the adverse decision. The burden then shifts to plaintiff to show that the stated reason is a pretext for discrimination. To establish pretext, plaintiff must show that the defendant's articulated reason: (1) lacks a basis

13

in fact, (2) did not actually motivate the defendant's actions, or (3) was insufficient to motivate the defendant's actions. *Carroll v. Ohio Dept. of Administrative Services*, 555 Fed.Appx. 512 (6th Cir. 2014) (citations omitted).

Defendants assert that plaintiff cannot satisfy her prima facie case because she cannot prove she suffered any adverse employment action or that similarly situated individuals were treated better than she was treated.

Plaintiff asserts she suffered adverse employment actions when defendants issued unwarranted discipline, subjected her to surveillance, suspended her indefinitely without pay, terminated her employment, and constructively discharged her.

The discipline and surveillance are not adverse employment actions. An adverse employment action is "a materially adverse change in the terms of [the employee's] employment." *Kocsis v. Multi–Care Mgmt., Inc*., 97 F.3d 876, 885 (6th Cir.1996). "Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change." *Mensa v. Mich. Dept. of Corrections,* 2015 WL 4665430, __Fed.Appx.__ (6th Cir. August 7, 2015) (citations omitted).  Meyer's undisputed declaration testimony is that the corrective actions and PIP did not result in a demotion, and plaintiff did not lose any compensation, seniority, benefits, or hours of work.  (Meyer decl. ¶ 6)

 Furthermore, the Sixth Circuit has recognized, "We have held that a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." *Peltier v. United States,* 388 F.3d 984 (6th Cir. 2004)(internal quotations and citations omitted). According to notes created by Meyer on July 18, 2014 of

14

the conversation she had with plaintiff that day,

> I told Farley that her actions were inappropriate and that she is being suspended
> pending investigation.  I informed her that I would be doing a full investigation of this
> serious occurrence.  I told Farley that she would be suspended for at least 3 days,
> Mon, Tues, and Wed, and that I would contact her to let her know when to return to
> work.  I told her that she is not to return to work or call in to the unit until I called her.

(pltf. depo. Ex. 27)  Plaintiff asserts the suspension was without pay. Plaintiff points to her

affidavit testimony that she has "not received any payment for the days [she] was allegedly

suspended." (pltf. aff. ¶28).  Plaintiff also refers to Meyer's deposition testimony, but she

testified:

> Q. And [the suspension] was going to be without pay?

> A. The decision hadn't been made at that point. At this point it was with pay.

> Q. So did you address this with [plaintiff] either way?

> A. No, I didn't.

(Meyer depo. 263-264) Finally, plaintiff points to the deposition of Debbie Brosovich

wherein she testified:

> Q. And when she received the suspension, the suspension was without pay at that

> time, correct?

> A. Yes.

(Brosovich depo. 188).

Meyer stated in her declaration, "Further, when plaintiff was suspended for three days

(pending investigation), had the investigation revealed that plaintiff did not engage in any

improper conduct, the suspension would have been with pay." (Meyer decl. ¶6)

The facts only show that plaintiff was suspended on July 18, with the suspension to

run at least Monday, Tuesday, and Wednesday.  Plaintiff submitted her resignation by email of July 21, 2014 at 12:08 a.m. effective (and dated) Sunday, July 20, 2014. July 18 would have been a Friday given plaintiff's own resignation letter which states that July 20 was a Sunday. Therefore, plaintiff did not serve her suspension but resigned her employment before it began.  On this basis, plaintiff cannot show she suffered a financial loss as a result of it. Whether or not the suspension would have been with or without pay is immaterial given that plaintiff resigned before serving the suspension. Accordingly, the suspension was not an adverse employment action.

Next, Plaintiff asserts that a jury could conclude that defendants terminated her on July 18.  But, the evidence shows she was suspended as of that date.  Plaintiff asserts that she was removed from the timekeeping system.  However, the evidence only shows that plaintiff was removed from her Monday through Wednesday shifts.  (Kristen Vargo depo. 23) There is no evidence that plaintiff was actually terminated and this was not an adverse employment action.

Finally, plaintiff asserts she was constructively discharged.  "To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person;[5] (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit." *Hurtt v. International Services, Inc*., 2015 WL 5332531, __Fed.Appx.__ (6th Cir. Sept. 14, 2015) (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir.2012)).

---

[5]     This "reasonable person" standard obviates plaintiff's argument that she quit
because *she* "reasonably believed her termination was imminent."  (Doc. 29 at 13)

Plaintiff asserts she was subjected to intolerable working conditions.  Plaintiff contends she was constantly harassed by her younger co-workers who called her "oldbie" or "old bitch"and made disparaging comments about Chinese people.[6]  Plaintiff points to her deposition testimony that when she told Debbie Brosovich in December 2012 about the Chinese comments, she was told she was overreacting and being sensitive. (pltf. depo. 342) Plaintiff also asserts that in May 2014 she complained to Lisa Ullman in HR that Meyer created a hostile working environment; discriminated against her on the basis of her age, race, and national origin; and was trying to terminate her.  But, HR did not investigate the complaints. (Ullman depo. 76-78)

These facts simply do not amount to evidence of an intolerable working environment as perceived by a reasonable person. At most, plaintiff points to evidence that her co-workers made comments about her age which do not appear to have been reported.  One co-worker made comments about her Chinese heritage which, although reported, do not amount to intolerable working environment created by defendants.  This leaves Meyer's comments about retirement, which plaintiff reported.  Even accepting plaintiff's facts as true, Meyer's comments simply do not amount to intolerable working conditions.  Plaintiff testified that at the time of her two recent reviews, Meyer would say, "Well, Farley Lee, things have changed and you've been here some time.  When are you going to retire?"  And, on one occasion plaintiff was walking in the skyway with a "flower display" given to her by a patient.  She encountered Meyer and offered it to her.  Plaintiff then told Meyer that she was going to the gym to "de-stress."  Meyer responded that "my father was a laborer when he was 15 years old

---

[6]     Plaintiff does not assert a hostile work environment claim.

17

and he doesn't know when to stop." (pltf. depo. 305-306) No reasonable person would perceive these comments to amount to intolerable working conditions. Moreover, there is no evidence that defendants "deliberately created" the intolerable working conditions or that the conditions were created with the intention of forcing plaintiff to quit.

Having found no adverse employment action, the Court need not proceed to the fourth element, i.e, whether plaintiff was replaced by someone outside the protected class or similarly situated non-protected employees were treated more favorably than plaintiff. Even if the Court were to reach this prong, it is not satisfied.

Plaintiff asserts that Meyer admitted to hiring a 29 year old male to replace plaintiff. Plaintiff points to Meyer's deposition testimony wherein she acknowledges a job posting which was "a job that Farley had." The younger male was selected for the job. (Meyer depo. 291-292) Defendants do not address this contention. However, it is not clear from the testimony that the male was actually hired to replace plaintiff's position or merely was selected for a job plaintiff had previously performed. Plaintiff asserts that younger, non-Asian RNs were treated more favorably than she.

Under the well-established Sixth Circuit standard,

[T]he plaintiff and a comparable employee must be similar in all of the relevant aspects in order to be similarly situated. In the disciplinary context, we have held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of comparable seriousness. Relevant factors for comparison purposes include the employees' conduct, employment standards, and whether the employees have dealt with the same supervisor. Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.

*White v. Duke Energy-Kentucky, Inc.*, 603 F. Appx 442, 451 (6th Cir. 2015) (internal citations and quotations omitted). Individuals with whom the plaintiff seeks to compare her treatment

must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Gunn v. Senior Services of Northern Kentucky*, -- Fed.Appx. – 2015 WL 7959689 (6th Cir. Dec. 7, 2015) (citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344 (6th Cir. 1998)).

Plaintiff testified that she had a heavier workload with more complex patients than her younger, Caucasian colleagues and that others were allowed to use foul language without discipline.  (pltf. depo. 44) However, she does not identify specific comparators and, more importantly, plaintiff was not disciplined regarding her workload or foul language.

Plaintiff contends that Shirley Ramos also had patient complaints that she was rude but was not disciplined. The evidence shows that in October 2012, there was a patient complaint that Ramos was rude.  Ramos was questioned that day by the Assistant Nurse Manager.  In July 2014, Meyer recorded a complaint that a patient said that Ramos was rude, curt, and mean.  An Assistant Nurse Manager met with Ramos regarding the complaint and Ramos apologized for the interaction.  (Doc. 29 Ex. 176) Ramos is not similarly situated.  A colleague complained in August 2013 that plaintiff was rude and made comments about patients.  Plaintiff had a documented patient complaint in November 2013 that she was rude. In her performance review, completed in early April 2014, it was noted that plaintiff could "come across as harsh when she interacts with patients and colleagues."  Thereafter, plaintiff's Corrective Action Report, dated April 30, 2014, noted that plaintiff had multiple complaints from patients and family members regarding her approach to patient care.  Two specific incidents of April 10 and 14 were noted.  Thus, plaintiff's history was different from

19

that of Ramos's.

Plaintiff also compares herself to Christie White, Carla Andrei, Jennifer Glover, and Macia Digiovanna.

Plaintiff points out that White also failed to appropriately monitor a patient, like she allegedly did in July 2014, but did not receive a corrective action.  Defendants point out that there are "differentiating or mitigating circumstances that would distinguish [White's] conduct or the employer's treatment of [her] for it."  In particular, it was noted on plaintiff's Corrective Action Report that "[w]hen this situation was reviewed with you, you took no personal accountability for the lack of nursing care and communication provided."  White, on the other hand, "verbalized [her understanding" when the situation was discussed with her with the Assistant Nurse Managers. (Doc. 32 Ex. 173) Also, plaintiff's July Corrective Action Report cites to a second earlier related incident.

Plaintiff points to a patient complaint that he was fearful that Andrei would become upset and pour water over his head.  Like plaintiff, the Assistant Nurse Manager discussed the complaint with Andrei.  There is no indication that Andrei had other complaints or informal counselings as plaintiff had. (*Id.* Ex. 177)

Plaintiff points out that Glover failed to take vital signs and monitor a patient but she did not receive a corrective action.  But, it is not disputed that this was Glover's first informal counseling. Further, when counseled, Glover stated that she was "very sorry that this happened."  Like plaintiff, however, Glover was also told that another similar incident would "result in corrective action." Glover "verbalized [her] understanding."  (*Id.* Ex. 175)

Finally, Digiovanna had a serious medication error but did not receive a corrective

action.  There is no evidence that she had previous similar conduct.  When spoken to,

Digiovanna stated that she "must have looked at something wrong" and agreed to be more

careful.  (*Id.*)  Meyer testified that when she counseled her, Digiovanna admitted the mistake

and was upset, very reflective, sorrowful, and felt badly.  (Meyer depo. 327) Therefore, there

were mitigating circumstances. Nonetheless, plaintiff's error occurred after she was already

on a PIP and had received a corrective action.  Additionally, as stated before, plaintiff had

also had a previous similar incident.

　　　　As defendants point out, this evidence shows that plaintiff was treated in the same

manner as these other employees.  All the RNs  were counseled about their incidents, as was

plaintiff, and an anecdoctal placed in their files. Plaintiff had several counselings and

anecdotals placed in her file before her first Corrective Action Report and PIP in April 2014.

　　　　Because plaintiff cannot establish a prima facie case, her claim of discrimination fails

and the Court need not proceed to the issue of pretext.  Even if it did, the fact that there was

no adverse employment action renders impossible the inquiry of whether defendants have

asserted a non-discriminatory reason for the adverse action.

　　　　Defendants argue that plaintiff cannot establish pretext because she has admitted to all

of the essential, underlying facts that lead to the two corrective actions, the PIP, and the

suspension pending investigation.  As discussed above, these decisions do not amount to

adverse employment actions and, therefore, it would not be appropriate for the Court to

analyze them. If the Court did examine them, it would agree with defendants that plaintiff has

not demonstrated pretext.

　　　　Plaintiff argues that defendants have provided no credible evidence to support their

actions as there is no patient statement to corroborate the April and July 2014 Corrective Action Reports. This Court disagrees.

The April 30, 2014 Corrective Action Report identifies two incidents of April 10, wherein a patient and family stated plaintiff was pushy and abrasive and placed blame on the patient for not communicating a medication concern, and April 14, wherein a patient and family stated that plaintiff was pushy and placed blame for a medication error on someone else who was not present. Plaintiff's affidavit testimony is that she "disagreed" with the discipline. Plaintiff was questioned at deposition regarding both incidents. Plaintiff did not deny that the incidents occurred. With regard to the first, she agreed that she told the patient that the patient should have taken care of the medication issue with the doctor in the cath lab prior to returning to the floor and that now plaintiff had to call multiple people to take care of it and did not have the time that day to do so. Plaintiff testified that she told the patient this because, being a nursing assistant and a four time patient at the CCF, the patient "knew of her meds" and should have known to ask the doctor. (pltf. depo. 140-141) As to the second incident, plaintiff admitted there had been a medication oversight, that a nursing student was involved, and she had told the patient's family to "keep it discreet." Plaintiff agreed that there was a mistake by the nursing student and plaintiff told the patient not to discuss it with anyone. (*Id.* 141-148)

The fact that defendants do not submit corroborating statements from the patients regarding the incidents is irrelevant. Plaintiff's contention in her brief that defendants "fabricated" the incidents is unfounded as evidenced by her own deposition testimony. Moreover, following an incident in November 2013 when a patient's family complained that

plaintiff was rude, plaintiff told Meyer that she understood that if similar incidents occurred, a corrective action may issue. (pltf. depo. Exs. 15-16)

Plaintiff contends that the July 30, 2014 Corrective Action Report was "a second false corrective action" containing a "false" allegation by defendants. (Doc. 29 at 6) That action stated,

> On 7/14/14 it was noted that you did not provide safe care for a patient with a serious medical condition (Aneurysm). You Failed to monitor and escalate elevated vital signs to the medical team. Notification of the patients' arrival to the nursing unit and of their condition was not timely (4+ hours), This resulted in significant delay of treatment. Taking no personal accountability for the lack of nursing care and communication provided.

Plaintiff points out that the patient never complained, did not suffer an injury, and, in fact, gave plaintiff a "Caregiver award" on July 15, 2016.  This is true, but at deposition, plaintiff admits to the underlying facts.  She testified that she knew by 10 a.m. that with a patient with an abdominal aortic aneurysm and blood pressure of 172 over 78, the chief resident needed to be contacted.  Plaintiff told the secretary to contact the doctor but the secretary "had an attitude" or was "sitting up front doodling."  Then, plaintiff "got very busy" and checked on the patient at 12:45 and learned no doctor had seen her. Plaintiff "panicked" and paged the doctor "intranet, audible, and overhead page." The doctor arrived later. (pltf. depo. 226-228) Therefore, while plaintiff asserts that defendants "fabricated" the incident, plaintiff's own testimony shows otherwise.  While plaintiff "disagreed" with the corrective action and believed she provided appropriate care, the Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for taking an adverse employment action. The rule states that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was

23

pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Maben v. Southwestern Medical Clinic,* 2015 WL 6719158, - Fed. Appx.- (6th Cir. November 4, 2015) (internal quotations and citations omitted) The "key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir.2007) (internal quotation marks omitted). An employer that reasonably and honestly relies on particularized facts in making an adverse employment decision is entitled to summary judgment on pretext, "even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem Co.,* 580 F.3d 394 (6th Cir. 2009) (citations omitted). Plaintiff really does not even dispute the facts but merely believes she was not in the wrong. The fact that the patient did not complain, did not suffer harm, and gave the plaintiff an award does not change the fact that the defendants honestly believed that plaintiff did not provide safe care for the patient.

Likewise, as for the suspension, plaintiff admitted to having the conversation with the patient and telling the patient she had been fired.  Plaintiff disagreed that the conversation was inappropriate.  Again, defendants had an honest belief that suspending plaintiff pending an investigation of that matter was justified because they considered plaintiff's conversation with the patient to be inappropriate.

Plaintiff fails to demonstrate pretext and her discrimination claims fail.

**(2) Retaliation**

24

As with the discrimination claim, plaintiff must first establish a prima facie case of retaliation by establishing that (1) she engaged in a protected activity; (2) defendants knew of the protected activity; (3) defendants subsequently took an adverse employment action; and (4) a causal connection exists between the protected activity and the materially adverse action. *Veluzat v. Williamson Medical Center,* 2015 WL 5827547, __Fed.Appx.__ (6th Cir. Oct. 7, 2015) (citations omitted). If plaintiff establishes a prima facie case, the burden shifts to defendants to produce a legitimate, non-retaliatory reason for its action.  The burden then shifts back to plaintiff to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual. *Id.*

The Court assumes plaintiff engaged in a protected activity of which defendants knew[7], but, for the reasons stated above, the claim fails because, at a minimum, there was no

---

[7]     It is not clear whether plaintiff complained of discrimination prior to the first decision to issue corrective action. Plaintiff asserts that "days after [she] complained about discrimination, defendants issued [plaintiff] her first ever corrective action and PIP on April 30, 2014."  (Doc. 29 at 5) As discussed above, plaintiff testified that she complained to Brosovich on April 17 or 18.  Plaintiff also acknowledges in her affidavit that Meyer called her into her office on April 15 to accuse her of being pushy or abrasive with a patient. Brosovich testified that plaintiff came to see her in April 2014 and, at that point, the Corrective Action and PIP were in final form although not issued. (Brosovich depo. 94-95). Plaintiff's emails to Prendergast and Ullman were in May 2014- after the Corrective Action and PIP were issued.

Meyer's declaration states, "The records produced by plaintiff affirm my recollection that on April 17, 2014, I reached out to CCF's employee assistance program- CONCERN- to seek guidance on how to speak with an employee (plaintiff Farley Lee) who was being issued a PIP and corrective action, but would not listen to any constructive criticism or be reflective."  (Meyer decl. ¶ 5) The declaration attaches a document showing that the employee assistance program file was opened on April 17, 2014 by "supervisory referral," and a "supervisory consult" occurred on April 17 (*Id.* Ex. 1)

adverse employment action.  Furthermore, there is no pretext.

**(3) State law claims**

For the reasons stated above finding no discrimination or retaliation claims to have merit, plaintiff's claims of negligent retention, supervision, and hiring; intentional infliction of emotional distress; and aiding and abetting also fail.

<u>**Conclusion**</u>

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.


IT IS SO ORDERED.



 /s/ Patricia A. Gaughan             
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/4/16

26